**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Yardbird Group LLC, *et al.*,[1] | Case No. 26-11479 (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF ALBERT ALTRO IN SUPPORT**
**OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Albert Altro, Chief Restructuring Officer of Yardbird Group, LLC ("Yardbird Group"), Yardbird Beverly Hills, LLC ("YB Beverly Hills"), Yardbird DC, LLC ("YB DC"), Yardbird Chicago, LLC ("YB Chicago"), Yardbird Denver LLC ("YB Denver"), YB Las Vegas, LLC ("YB Las Vegas"), The Bird Singapore LLC ("YB Singapore"), Southern Operations, LLC ("Southern Operations"), Yardbird DFW LLC ("YB DFW"), Yardbird DFW Management LLC ("DFW Management"), and Yardbird DFW Concession LLC ("DFW Concession") (collectively, the "Debtors" or the "Company"), hereby declare under penalty of perjury:

1. I am a Managing Director of Traverse, LLC ("Traverse") and the Chief Restructuring Officer (the "CRO") for each of the Debtors in the above-captioned chapter 11 cases (the "Chapter 11 Cases"). I was appointed CRO of the Debtors on or around September 1, 2026.

2. I have over 28 years of experience in corporate restructuring, public accounting and executive management, and consulting, primarily in a leadership role. My experience spans a

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: Yardbird Group LLC (7139); Southern Operations, LLC (5384); Yardbird Beverly Hills, LLC (9735); Yardbird DFW, LLC (2545); Yardbird DC, LLC (2651); Yardbird Chicago, LLC (6273); Yardbird Denver LLC (8819), YB Las Vegas, LLC (4071), Yardbird DFW Management LLC (8949), Yardbird DFW Concession LLC (1952), and The Bird Singapore LLC (8264). The location of the Debtors' service address in these chapter 11 cases is 3355 Las Vegas Boulevard South, Las Vegas, Nevada 89109.

variety of industries and organizations, servicing primarily middle-market privately-held corporations, including as debtors in possession.

3. Prior to forming Traverse, I worked at KPMG in both the auditing group and the strategic consulting practice, was a Director at PricewaterhouseCoopers in the Transaction Services Group, and previously worked as a corporate restructuring advisor at Zolfo Cooper. Throughout my career, I have served in executive officer capacities multiple times, including numerous engagements as a chief restructuring officer, chief operating officer, and chief financial officer. I am also a Certified Public Accountant and Certified Insolvency Restructuring Advisor.

4. I formed Traverse in 2005. Traverse provides restructuring and turnaround services to assist underperforming organizations in both financial and operational capacities. Traverse's professionals work with clients to identify and address liquidity and operational concerns and assist in finding and implementing solutions to such problems. Traverse and its professionals have assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous cases, including the following: *In re Geddo Corp.*, (Bankr. C.D. Cal. 2026); *In re Smarthome Ventures d/b/a Pepper* (Bankr. D. Del. 2024); *In re Tree Lane LLC* (Bankr. C.D. Cal. 2024); *In re BHCosmetics* Holdings, LLC (Bankr. D. Del. 2022); *In re JAB Energy Sols. II, LLC* (Bankr. D. Del. 2021); *In re Bumble Bee Parent, Inc.* (Bankr. D. Del. 2019); *In re Food 4 Health Int'l, LLC* (Bankr. D. Utah 2018); *In re Paramount Building Sols., LLC* (Bankr. D. Ariz. 2017); *In re Peekay Acquisition, LLC* (Bankr. D. Del. 2017); and *In re Am. Laser Skincare, LLC* (Bankr. D. Del. 2014).

5. The Debtors engaged Traverse around April 2026 to provide financial advisory services. Later, on September 1, 2026, the Debtors expanded Traverse's engagement to provide a chief restructuring officer and restructuring advisory services. Since commencing its engagement,

Traverse, including myself, has worked closely with the Debtors' management team and other key members including the finance, operation, and human resources teams to understand the Debtors' cash flows and operations, and otherwise prepare for these Chapter 11 Cases.

6. In my capacity as CRO of the Debtors, and as a result of my discussions with the Debtors' employees, consultants, professionals, and members of their respective governing bodies, I have become familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I am also familiar with the Debtors' relationships with their vendors, service providers, employees, third party contractors, customers, investors, and other key stakeholders.

7. On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "Court") for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to manage and operate their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. To minimize any disruption or other adverse effect resulting from the filing of the Chapter 11 Cases, the Debtors are filing contemporaneously herewith various motions and pleadings seeking certain "first day" relief (collectively, the "First Day Motions"). I submit this declaration (this "Declaration") to assist the Court and parties in interest in understanding the Debtors, their business, and the circumstances leading to these Chapter 11 Cases. I also submit this Declaration in support of the Debtors' chapter 11 petitions and the First Day Motions.

8. Except as otherwise indicated herein, the statements in this Declaration are based on (i) my personal knowledge of, and familiarity with, the Debtors' operations, finances, restructuring, and sale efforts; (ii) my review of relevant documents and information provided to me by employees of or advisors to the Debtors or their professionals; (iii) my opinion based on my experience and knowledge of the Debtors' operations and financial and business affairs, including

my general knowledge of the industry in which the Debtors operate; (iv) information that I have received from the Debtors' employees or advisors, or (v) the Debtors records maintained in the ordinary course of business. I have obtained this information during my tenure working with the Debtors and their professionals, including the Debtors' corporate and restructuring counsel. In making this Declaration, I have also relied on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing this Declaration.

9. I am not being compensated specifically for this testimony other than through payments received by Traverse as a professional proposed to be retained by the Debtors. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors.

10. To better familiarize the Court with the Debtors and their business, this Declaration is organized into two sections as follows:

- **Part I** provides background information regarding the Debtors' business, including their corporate history and operations;
- **Part II** provides an overview of the Debtors' prepetition capital structure;
- **Part III** describes the circumstances leading to these Chapter 11 Cases;
- **Part IV** provides an overview of the prepetition sale and financing process; and
- **Part V** discusses the First Day Motions.

## I. Corporate History and Business Operations

### A. The Debtors' Business Operations

11. The Debtors own and operate "Yardbird Southern Table & Bar," an award-winning polished casual dining concept offering a modern take on traditional Southern American cuisine. Beyond its famed fried chicken, Yardbird is known for its weekend brunch, chef-curated bourbon dinners, and an award-winning mixology program and extensive wine list, all served in an inviting, open atmosphere anchored by signature floor-to-ceiling windows and open kitchens.

12. Yardbird's menu balances American Southern classics with lighter offerings, creating a broad-based dining experience appealing to diverging customer preferences. Since its inception, the Debtors have received numerous culinary accolades, such as the James Beard Foundation Award, Bon Appètit Award, and Food and Wine Award, and is recognized as one of the best destinations in the United States for fried chicken.

13. The Debtors currently own and operate three restaurant locations in Dallas, Texas; Washington, D.C.; and Chicago, Illinois, and license two locations in Las Vegas, Nevada and Singapore. The Debtors employ approximately 508 people across both the Company-owned and licensed locations. Prior to the Petition Date, the Debtors closed their locations in Los Angeles, California; Denver, Colorado; and Miami, Florida.

14. In addition to sales generated from daily restaurant operations, event dining and catering represent a significant portion of the Debtors' revenue.

**B. The Debtors' Corporate History**

15. In 2011, a group of restaurants entrepreneurs (the "Founders") founded what would eventually become the Debtors' business. Generally, the Debtor entities were formed as Yardbird restaurant locations started to open, each associated with a different restaurant.

16. Under the Founders' leadership, the Company opened and operated a Yardbird restaurant in Miami Beach, Florida in 2011 ("Yardbird Miami") and opened one licensed location in Las Vegas, Nevada ("Yardbird Vegas") in 2015.

17. In an effort to combine and expand the existing businesses, in 2017 Yardbird Group was formed and a private equity sponsor (the "Sponsor") invested in the Company, maintaining,

at first, minority control of the business.[2] To that end, the Company opened five additional owned and operated restaurant locations by 2023 in Los Angeles, California ("Yardbird LA"); Dallas, Texas ("Yardbird Dallas"); Washington, D.C. ("Yardbird DC"); Chicago, Illinois ("Yardbird Chicago"); and Denver, Colorado ("Yardbird, Denver"), and one additional licensed location in Singapore ("Yardbird Singapore"). Generally, the Company entered into leases and built out the spaces for each of these new restaurant locations to align with the Yardbird brand.

### C. The Debtors' Corporate Structure

18. Debtor Yardbird Group, a limited liability company formed in the state of Delaware, currently owns 100% of each of the other Debtor entities except DFW Concession, which is 100% owned by Debtor DFW Management. An organizational chart illustrating the corporate structure of the Company is below, with the Debtors highlighted in blue.




## II. The Debtors' Prepetition Capital Structure

19. As of the Petition Date, the Debtors are obligors with respect to approximately $24,838,611.31 million in funded debt obligations, summarized as follows:

| Funded Debt | Approximate Principal Amount Outstanding |
|---|---|
| Brightwood Loan Facility | $13,324,252.00 |
| CNB Main Street Loan Facility | $8,387,916.71 |
| InKind Obligations | $3,126,442.60 |
| **Total Secured Debt Obligations** | **$24,838,611.31** |

---

[2] In 2025, the Sponsor and the Founders parted ways and, as a result, the Sponsor became the 100% owner of Yardbird Group.

**A. The Brightwood Loan Facility**

20. Prior to the Petition Date, Yardbird Group LLC as borrower ("Yardbird Group" or the "Prepetition Borrower"), and Yardbird DFW, LLC ("YB DFW"), Yardbird DC, LLC ("YB DC"), Yardbird Chicago, LLC ("YB Chicago"), Yardbird Denver LLC ("YB Denver"), The Bird Singapore LLC ("YB Singapore"), Yardbird Beverly Hills, LLC ("YB Beverly Hills"), and YB Las Vegas, LLC ("YB Las Vegas") as guarantors (the "Guarantors," and together with the Prepetition Borrower, the "Credit Parties"), entered into that certain *Credit and Guaranty Agreement*, dated as of July 28, 2022 (as amended by that certain *Amendment No. 1 to Credit and Guaranty Agreement*, dated as of April 19, 2024 and that certain *Amendment No. 2 and Waiver to Credit and Guaranty Agreement*, dated as of November 14, 2025, and as may be further amended, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition Credit Agreement") with the lenders from time to time party thereto (the "Prepetition Lenders") and Brightwood Loan Services LLC as administrative agent and collateral agent (the "Prepetition Agent," and collectively with the Prepetition Lenders, the "Prepetition Secured Parties"). The Prepetition Credit Agreement provides for an initial term loan and delayed draw term loans in the aggregate principal amount of $13,000,000.00.

21. As of the Petition Date, the aggregate outstanding principal amount under the Prepetition Credit Agreement is not less than $13,324,252.00 (together with accrued and unpaid interest, fees, and other amounts owing thereunder, the "Brightwood Prepetition Obligations"). The Brightwood Prepetition Obligations are secured by valid, binding, perfected, and enforceable first-priority liens (the "Prepetition Liens") on substantially all of the Debtors' assets, with the exception of the assets of Southern Operations, on which the Prepetition Secured Parties hold a second priority lien.

22. In connection with the Prepetition Credit Agreement, the Credit Parties, Debtor Southern Operations, and non-debtor The Bird Singapore Pte. Ltd. ("The Bird Ltd.") collectively, the "Non-Credit Parties") entered into that certain *Intercompany Subordination Agreement*, dated July 28, 2022, thereby subordinating all indebtedness, liabilities, and other obligations of any Credit Party owing to such Non-Credit Party in respect of any and all loans or advances made by such Non-Credit Party to such Credit Party for the benefit of the Prepetition Secured Parties.

**B. The CNB Main Street Loan Facility**

23. On or about August 11, 2020, Debtor Southern Operations, as borrower, and Debtor Yardbird Group, as guarantor, incurred indebtedness in favor of City National Bank of Florida ("CNB") in the amount of $9,932,178.00 through the "Main Street Loan Facility Program" (the "CNB Main Street Loan Facility") as established by the Board of Governors of the Federal Reserve System under Section 13(3) of the Federal Reserve Act. The CNB Main Street Loan Facility was subsequently amended pursuant to that certain *Amendment and Ratification of Loan and Security Agreement*, dated April 8, 2025, effective as of August 11, 2024 (the "Main Street Facility Amendment," together with the CNB Main Street Loan Facility and all documents related thereto, the "CNB Main Street Loan Documents"), by and between Southern Operations, as borrower, CNB, as lender, Yardbird Group, as the "Existing Guarantor" (as defined in the Main Street Facility Amendment), and Debtors YB DFW, YB Denver, YB DC, YB Chicago, and YB Beverly Hills as "New Guarantors" (as defined in the Main Street Facility Amendment).

24. Pursuant to the CNB Main Street Loan Documents, CNB holds a first priority security interest in the collateral of Southern Operations, which, at this time, consists of stored equipment and possibly a liquor license related to the close Miami location, and a second priority security interest in the collateral of Yardbird Group, YB DFW, YB DC, YB Chicago, YB Denver,

and YB Beverly Hills. As of the Petition Date, approximately $8,387,916.71 remains outstanding on account of the CNB Main Street Loan Facility.

25. On or about March 24, 2026, CNB initiated litigation against Debtors Southern Operations, YB Beverly Hills, YB Chicago, YB DC, YB DFW, and YB Denver in the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida for breach of contract and enforcement of the CNB Main Street Loan Documents (the "CNB Litigation"). As of the Petition Date, the CNB Litigation remains pending.

**C. InKind Obligations**

26. On June 27, 2025, Debtor Yardbird Group and certain of its debtor affiliates entered into that certain *Credit Purchase Agreement* (as amended, supplemented, or otherwise modified from time to time, the "inKind Agreement") with inKind Cards Inc., inKind Credit Fund LP, and inKind Warehouse Facility, LLC (collectively, "inKind"). Under this agreement, inKind provided working capital to the Debtors in exchange for credits (the "Credits") to be redeemed by inKind's customers at the Debtors' restaurants. Customers who purchase Credits from inKind may then redeem the Credits at the Debtors' restaurants. As of the Petition Date, approximately $3,126,442.60 remains outstanding under the inKind Agreement.

27. In accordance with the terms of the inKind Agreement, inKind filed a UCC-1 financing statement against each of YB DFW, YB DC, YB Chicago, YB Denver, and YB Beverly Hills (collectively, the "inKind-Debtors") asserting a perfected lien on the inKind-Debtors' collateral, including among other things, accounts receivable, domestic inventory, general intangibles, equipment, promissory notes and instruments. Accordingly, inKind holds a third priority perfected lien on the inKind-Debtors' Article 9 collateral.

28. As of the Petition Date, the order of priority of the funded debt obligations is as follows:

| Collateral | Priority | Facility |
|---|---|---|
| Substantially all of the respective assets of Debtors Yardbird Group, YB DFW, YB DC, YB Chicago, YB Denver, DFW Management, DFW Concession, YB Singapore, YB Beverly Hills, and YB Las Vegas | First | Prepetition Credit Agreement |
| Substantially all of the assets of Debtor Southern Operations | First | CNB Main Street Loan Facility |
| Substantially all of the respective assets of Debtors Yardbird Group, YB DFW, YB DC, YB Chicago, YB Denver, and YB Beverly Hills | Second | CNB Main Street Loan Facility |
| Substantially all of the respective assets of Debtors YB DFW, YB DC, YB Chicago, YB Denver, and YB Beverly Hills | Third | inKind Agreement |

### D. Unsecured Claims

29. As of the Petition Date, the Debtors' unsecured claims are estimated to be about $24,155,000.

## III. <u>Circumstances Leading to These Chapter 11 Cases</u>

30. The Debtors' financial difficulties developed over a period of several years and were driven by a combination of significant expansion-related expenditures, location specific operating challenges, the lasting effects of the COVID-19 pandemic, and an increasingly burdensome capital structure.

31. After the Sponsor's initial investment in the Yardbird business in 2017, the Company pursued an expansion strategy that resulted in additional leases being entered into, multiple location buildouts, which incorporated award-winning architecture and design, and six new restaurant locations being opened across a number of major domestic and international markets, including Los Angeles, Dallas, Washington, D.C., Denver, Chicago, and Singapore. That expansion required substantial capital investment, and, over time, the Company incurred additional

indebtedness, including those noted above, to fund these restaurant openings and related capital expenditures. The onset of the COVID-19 pandemic materially complicated those expansion efforts.

32. Additionally, like countless other companies in the food services industry, the Debtors did not anticipate the unprecedented disruption to the restaurant business caused by the COVID-19 pandemic. COVID-19 dramatically impacted the restaurant industry due to quarantine mandates, which had the impact of: (1) closing in-store locations; (2) negatively affecting restaurant sales; (3) forcing businesses to change how their organizations fundamentally operated, including significantly greater reliance on food delivery apps to generate business; and (4) changing the demographic of certain, once urban and growing, urban areas, leading to decreased foot traffic and a change in expected revenue. The Debtors' businesses were similarly negatively affected by the impact of COVID-19, suffering irrecoverable damage.

**A. <u>Location Specific Operational Struggles</u>**

33. Over time, performance diverged significantly across the Yardbird portfolio. Certain locations continued to perform well, demonstrating the underlying strength of the Yardbird brand, while others were adversely affected by circumstances unique to their particular markets, some caused by the COVID-19 pandemic, including changes in neighborhood traffic patterns, tourism, convention activity, consumer behavior, and the development of surrounding trade areas.

34. The resulting losses at the underperforming locations placed increased pressure on the Company's liquidity and ultimately required the Company to close certain locations while pursuing turnaround initiatives at others. Specifically, the Company closed Yardbird Denver in 2025, and Yardbird LA and Yardbird Miami in 2026.

**B. <u>The Debtors Continue to Struggle</u>**

35. Despite the success of certain of the Company's locations, the Debtors continued to struggle. As losses accumulated at certain locations, the Company undertook a number of steps to stabilize the business and preserve liquidity. Among other things, as noted above, the Company closed underperforming restaurants, implemented location specific turnaround plans, and made changes to its senior management team, seeking to focus resources on the stronger portions of the restaurant portfolio. The Company also primarily engaged Traverse as its financial advisor at this time to assist in these endeavors.

36. Despite these efforts, the Company still faced mounting debt obligations (and looming maturity dates) arising from the financing used to support its expansion and restaurant operations. Therefore, in consultation with Traverse, the Company engaged with its lenders, including the Prepetition Secured Parties and CNB, and other stakeholders regarding potential restructuring alternatives and began evaluating broader strategic alternatives as its liquidity position became increasingly constrained.

37. In particular, the Company attempted to negotiate a restructuring with CNB concerning the CNB Main Street Loan Facility, which had a maturity date of August 11, 2025. Ultimately, those negotiations were unsuccessful and, unable to fulfill their obligations thereunder by the maturity date, those certain Debtors that are party to the CNB Main Street Loan Facility defaulted under the CNB Main Street Loan Documents. Accordingly, on March 24, 2026, CNB filed a complaint (the "<u>CNB Complaint</u>") in the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida styled as *City National Bank of Florida v. Southern Operation, LLC, et al.*, Case No. 2026-6092-CS-01vs, initiating the CNB Litigation. CNB filed a motion for summary judgment in the CNB Litigation and the deadline for the Company to respond is October 1, 2026.

## IV. Prepetition Sale and Financing Process

38. Given the Debtors' increasing debt obligations, the CNB Litigation, and the Debtors' need for liquidity, the Company expanded its consideration of strategic alternatives, ultimately concluding, in consultation with its advisors, that pursuing a sale of their assets through a chapter 11 process would be the best method to address its capital structure, maximize the value of the Yardbird brand and its viable locations, and provide a forum for an orderly restructuring of its obligations, for the benefit of all creditors and stakeholders. The pursuit of a sale transaction was also supported by the Prepetition Secured Parties who held a first lien on substantially all of the assets of the Debtors (with the exception of the assets of Southern Operations) and were willing to provide short-term funding to the Debtors.

39. Subsequently, on August 3, 2026, after it had become clear that the Debtors would likely need to commence these Chapter 11 Cases to complete an in-court sale process, the Debtors engaged Potter Anderson & Corroon LLP as restructuring counsel due to its substantial Delaware bankruptcy court experience. Around that same time, the Debtors also engaged Soravine Advisors LLC ("Soravine") to assist and advise the Debtors with the pursuit and effectuation of a going concern sale transaction.

40. Additionally, on September 2, 2026, the governing bodies of each of the Debtors appointed Adam Paul as the sole independent manager (the "Independent Manager") of Yardbird Group to evaluate and recommend strategic and financial alternatives or transactions that may be available to the Debtors in light of the Company's cash flow, liquidity, and general financial condition, including a potential refinancing of the Company's existing indebtedness, a sale of the Company, a recapitalization with one or more of the Company's existing lenders, and/or other strategic alternatives.

***i. Prepetition Marketing Process***

41. On August 21, 2026, Soravine began marketing the sale of all or substantially all of the Debtors' business and assets (the "Marketing Process"). In connection with this solicitation, the Debtors and their advisors prepared, among other things, a teaser, a confidential information memorandum/management presentation, and a proforma net working capital supplement. Soravine, on behalf of the Debtors, sent the teaser to and contacted over 170 potential buyers, consisting of a broad range of restaurant strategic groups and financial/distressed buyers, to solicit interest to (i) sign a non-disclosure agreement and (ii) receive additional information sufficient to provide the Company with proposals to acquire the Debtors' business or assets. Interested buyers were also given the opportunity to have additional questions answered to help them arrive at a valuation.

42. Twenty-One (21) interested buyers ("NDA Parties") executed non-disclosure agreements and were provided the confidential information memorandum/management presentation and proforma net working capital supplement. Two (2) NDA Parties submitted additional information requests, and one (1) NDA Party requested a call with myself to acquire additional information. The NDA Parties were invited to submit non-binding indications of interest ("IOI") for the purchase of the Debtors' business and assets on or before September 15, 2026.

43. The Debtors received three (3) IOIs for all or part of the Debtors' business. The IOIs were significantly below the first lien debt of the Company. In evaluating the IOIs, the Debtors analyzed, among other considerations: (i) the structure of the proposed transaction; (ii) the form and amount of consideration offered; (iii) the assets to be acquired and liabilities to be

assumed; (iv) certainty of close, and (v) execution risks. The Debtors met with their advisors and consulted with their key stakeholders before and after IOIs were submitted.

44. The Debtors' prepetition Marketing Process culminated in the negotiation of and entry into an asset purchase agreement (the "Stalking Horse APA") for substantially all of the Debtors' assets with an affiliate of the Prepetition Secured Parties (the "Stalking Horse") in exchange for a credit bid, subject to section 363(k) of the Bankruptcy Code, of the obligations owed by the Debtors under the DIP Facility and the Prepetition Credit Agreement, as well as an assumption of certain liabilities. The Stalking Horse APA does not provide for any break-up fee in favor of the Stalking Horse, but does seek approval of an expense reimbursement of up to $275,000 should the Stalking Horse not be the successful bidder.

45. The bid contemplated by the Stalking Horse APA will be subject to higher and/or otherwise better offers through the continued sale process the Debtors intend to run during these Chapter 11 Cases. To that end, and contemporaneously herewith, the Debtors have filed the Bidding Procedures Motion,[3] pursuant to which it is seeking to establish processes and procedures to affect a sale of all or substantially all of the Debtors' assets, as a going concern, to the highest and best bidder.

***ii. DIP Term Facility***

46. Concurrently with the Marketing Process, in late July 2026, I began soliciting for potential debtor in possession financing for these Chapter 11 Cases. In consultation with the

---

[3] *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Designating the Stalking Horse Bidder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief.*

Debtors and their other advisors, I prepared a teaser and developed a list of parties that could be interested in providing postpetition debtor in possession financing in these Chapter 11 Cases considering the financial circumstances of the Debtors. At the direction of the Debtors, I reached out to approximately eighteen (18) potential lenders, consisting of strategic groups, private equity firms, financial third-party investors, and traditional lending institutions, to provide debtor in possession financing through a superpriority priming facility.

47. I understand that substantially all of the Debtors' assets, including their cash on hand as of the Petition Date, are subject to first priority liens on substantially all of the Debtors' assets, with the exception of the assets of Southern Operations, on which the Prepetition Secured Parties hold a second priority lien, and, thus constitute cash collateral. Therefore, I inquired whether any of these third parties would be willing to extend postpetition debtor in possession financing to the Debtors on an unsecured, junior priority, or priming basis.

48. During this process, the Debtors received two (2) signed confidentiality agreements from interested third parties. At the same time, the Debtors continued their negotiations with the Prepetition Secured Parties. Ultimately, the Debtors received two (2) term sheets for potential debtor in possession financing—one from a third party and one from the Prepetition Secured Parties.

49. Following a series of arm's-length negotiations with the Prepetition Secured Parties (in their capacity as lenders under the DIP Facility, the "DIP Secured Parties"), who would not consent to being primed, the Debtors ultimately executed the term sheet provided by the Prepetition Secured Parties (the "DIP Term Sheet"), which is attached to the DIP Motion.[4] The

[4] *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief.*

DIP Term Sheet provides for senior secured debtor in possession financing on a superpriority basis in an aggregate principal amount of $5.4 million consisting of (a) $1.8 million of revolving new money credit commitments (the "New Money DIP Loans") and (b) a roll up of the Brightwood Prepetition Obligation as of the Petition Date in the amount of $2.00 of Brightwood Prepetition Obligation for every $1.00 of the New Money DIP Loans funded with such rolled up loans (the "DIP Facility").

50. Based on the outreach described above, and the feedback I received from third parties, I believe that there are no alternative sources of financing currently available—and I believe it is unlikely that any other third party would be willing to provide such financing—under the circumstances on both better and executable terms than those being provided by the DIP Secured Parties under the DIP Facility.

51. The DIP Facility will provide the Debtors with funding necessary to execute a value-maximizing sale transaction on terms that I believe are reasonable given the Debtors' circumstances. I understand that if the Debtors are unable to access the DIP Facility and use cash collateral, the Debtors will be unable to fund payroll obligations, procure goods and services from vendors, run the necessary sale process, or administer these Chapter 11 Cases, thereby dissipating value to the detriment of the Debtors' estates and stakeholders.

52. I understand that the DIP Facility contains certain case Milestones that the Debtors must meet throughout these Chapter 11 Cases. I understand that the Milestones were negotiated by the DIP Secured Parties and the Debtors, in consultation with their advisors, and that the Milestones are a condition to the DIP Secured Parties' provision of the DIP Facility. Based on my

discussions with the Debtors and their advisors, I believe that the Milestones grant the Debtors with adequate time to pursue a value-maximizing transaction.

***iii. Chapter 11 Case Timeline***

53. With the assistance of its advisors, the Debtors have structured a sale process to promote active bidding by interested parties and to confirm the highest or otherwise best offer reasonably available for its assets. The sale process proposed is designed to minimize unnecessary administrative costs, while providing for the opportunity to maximize the value the Debtors can recover from its assets.

**Illustrative Timeline Based on Bankruptcy Milestones**[5]

| Date | Event |
|---|---|
| **September 21, 2026** | Petition Date |
| **September 21, 2026** | File Bidding Procedures Motion |
| **October 8, 2026** | *Proposed* Bid Procedures Hearing |
| **October 27, 2026, at 4:00 p.m. (ET)** | Bid Deadline |
| **November 2, 2026, at 10:00 a.m. (ET)** | *Proposed* Auction Date |
| **November 9, 2026** | *Proposed* Sale Hearing |
| **November 30, 2026** | Deadline to Consummate Approved Sale |

54. The Debtors' ultimate goal in these Chapter 11 Cases is to achieve a value-maximizing result for their stakeholders through the sale of the Debtors' assets. The proposed case timeline is necessary and appropriate to facilitate a fair and open sale process that will maximize the value received for the Debtors' assets, and therefore is in the best interest of the Debtors and their estates.

## V. First Day Motions

55. The Debtors filed the First Day Motions concurrently with the commencement of these Chapter 11 Cases.

[5] All dates are subject to Court approval and availability.

56. A list of the First Day Motions is set forth below:

i. *Debtors' Motion for an Order Directing Joint Administration of the Debtors' Chapter 11 Cases*

ii. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Continue Intercompany Transactions, and (D) Maintain Exiting Business Forms; (II) Authorizing the Debtors' Banks to Honor All Related Payment Requests; and (III) Granting Related Relief*

iii. *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, and (IV) Granting Related Relief*

iv. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees, (II) Authorizing the Debtors' Banks to Honor All Related Payment Requests, and (III) Granting Related Relief*

v. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Existing Insurance Policies and Pay All Obligations Arising Thereunder and (B) Renew, Revise, Extend, Supplement, or Enter into New Insurance Programs; (II) Authorizing All Banks to Honor Payment of Insurance Obligations; and (II) Granting Related Relief*

vi. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Debtors to (A) Pay Prepetition Wages, Compensation, Employe Benefits, and Other Employee Obligations and (B) Continue Certain Employee Benefit Programs in the Ordinary Course; (II) Authorizing All Banks to Honor Prepetition Checks for Payment of Prepetition Employee Obligations; and (III) Granting Related Relief*

vii. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors, 503(b)() Claimants, and PACA/PASA Claimants; (II) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Obligations; and (III) Granting Related Relief*

*viii. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Maintenance, Administration, and Continuation of Debtors' Customer Programs and (II) Granting Related Relief*

ix. *Debtors' Motion for Entry of an Order (I) Authorizing Redaction of Certain Personally Identifying Information Within the Consolidated List of Creditors and Other Filings and (II) Granting Related Relief*

x. *Debtors' Application for Entry of AN Order Appointing Kurtzman Carson Consultants LLC dba Verita Global as Claims and Noticing Agent, Effective as of the Petition Date*

xi. *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (VI) Granting Related Relief*

57. The above First Day Motions seek authority to, among other things, secure debtor in possession financing, honor work-force related compensation and benefit obligations, pay certain prepetition claims, continue using the Debtors' bank accounts, and continue other operations in the ordinary course of business.

58. The Debtors have narrowly tailored these First Day Motions to meet the goals of: (i) continuing their operations in chapter 11 to preserve value for the Debtors' estates and their creditors; (ii) providing an adequate runway for the Debtors to effectuate a successful sale process; and (iii) establishing procedures for the efficient administration of the Chapter 11 Cases.

59. I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, information and belief, the facts set forth therein are true and correct. I incorporate by reference the factual statements set forth in each of the First Day Motions as though set forth herein. Based on my personal knowledge, information supplied to me by and discussions with other members of the Debtors' management, Debtors' counsel, professionals, and representatives, my review of relevant documents, my opinion based upon my experience and the aforementioned review and discussions, and as set forth in more detail below, I believe the relief sought in the First Day Motions is: (a) vitally necessary for the Debtors

to (i) effectuate a smooth transition into, and operate within, these Chapter 11 Cases, (ii) avoid immediate and irreparable harm, and (iii) avoid interruption or disruption to its business and estate to the greatest extent practicable; (b) in the best interests of the Debtors' creditors, estates, and other stakeholders; and (c) constitutes a critical element in preserving value during the Chapter 11 Cases until a successful sale process can occur.

60. Additionally, several of these pleadings request authority to pay certain prepetition claims. I understand that rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent that relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors' estates. Other relief will be deferred for consideration at a later hearing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: September 21, 2026

By: *[/s/ Albert Altro]{.underline}*
Name: Albert Altro
Title: Chief Restructuring Officer